UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                              Case No. 04-80641

v.                                             Hon. Nancy G. Edmunds

TODD RENZI, BERNADINO J. PAVONE,
JR., ABOOD SAMAAN, and GLORIA
TACTAC,

               Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' RENEWED JOINT MOTION TO DISMISS [100]

This matter comes before the Court on Defendants' renewed joint motion to dismiss the Indictment due to the government's destruction of evidence, pursuant to Federal Rule of Criminal Procedure 12(b)(2). On March 24, 2010, and continued on March 30, 2010, the Court held an evidentiary hearing on Defendants' motion. For the reasons set forth below, Defendants' motion is DENIED.

## I. Facts

On September 15, 2004, an indictment was unsealed which charged Bernadino Pavone, Todd Renzie, Abood Samaan and Gloria Tactac (Defendants) with thirty counts of mail fraud in violation of 18 U.S.C. § 1341. [Docket Text #3.] The Indictment generally charges that Defendants executed a scheme to defraud individuals by claiming that their company, ICR, employed an exclusive computer program that was capable of erasing negative and derogatory information from credit reports.

## A. ICR and NCER

All four Defendants are principals of ICR, a Michigan corporation in the business of selling "credit repair." All four defendants are also involved in a related company claiming to be the "educational arm" of ICR, NCER, but only Pavone and Renzi are principals.

ICR is organized as a "multi-level" marketing business, much like Avon or Tupperware. ICR recruited representatives who in turn recruited other representatives to sell the credit repair product. This representative structure is called a "genealogy" or "downline." Representatives are compensated by receiving a commission each time the credit repair product is sold. The higher up the representative is in the downline, the greater the compensation for its representatives.

As the business of ICR increased, it became more difficult to track customers, representatives, commissions and income. In September 1998, ICR purchased and began using JENKON software[1] to document customer and representative information,[2] to manage genealogies including downlines and commissions, and to generate IRS 1099 forms at the end of the year.

## B. Grand Jury Subpoenas

---

[1] JENKON is a system created specifically to manage large multi-level marketing businesses: one of its largest clients is Avon.

[2] According to Defendants, "[a]n important Jenkon feature for ICR was its record creation and maintenance of *all* interaction between the corporation and its representatives; Jenkon would become the representative's paperless file. Jenkon offered the best tracking module, (meaning communication/call logs with representatives). Whenever there was any ICR contact with a representative, whether good or bad or whether verbal or written, there was a record entry of the communication in Jenkon." (Defs.' Joint Supp. Memorandum in Support of Def.'s Mot. to Dismiss at 4 [Docket Text # 67] (emphasis in original).)

The government's investigation of ICR and its principals, Pavone, Tactac, Samaan, and Renzi, began in April 2000. During the course of the government's investigation, both before and after the Indictment, numerous subpoenas were directed to ICR. Six of these subpoenas are particularly relevant.

### 1. May 4, 2000 Subpoena

A subpoena issued on May 4, 2000 commanded the production of "[a]ny and all records for the period January 1995 to present for ICR." (Pl.'s Resp., Ex. A [Docket Text # 51].) This specifically included a "[l]ist of all current and past representatives ... all receipts and expenditures for ICR ... [including] commissions ... paid ... to representatives." (*Id.*)

According to the government, Defendants complied in part with the subpoena. However, "nothing as comprehensive as the information maintained in the JENKON system was produced ... Although it now appears that JENKON reports containing this information could easily have been run at the time the subpoena was issued." (Pl.'s Resp. at 3 [Docket Text # 51].)

### 2. March 5, 2001 Subpoena

On March 5, 2001, a subpoena was issued commanding the production of "[a]ny and all records regarding ... representatives including but not limited to ... notes, correspondence to or from ... representative ... for the period of January 1999 through present." (Pl.'s Resp., Ex. B [Docket Text # 51].)

Again, the government contends that Defendants only complied in part with the subpoena. However, "the type of disciplinary notes and impeaching evidence the defendants claim was kept in the JENKON system, although covered by this subpoena,

was not produced. The only possible exceptions are three hard copy files containing information on four terminated representatives. These files were not produced in compliance with any grand jury subpoena, but as a result of the defendants' effort to convince the government that it was relying on untrustworthy witnesses." (Pl.'s Resp. at 3-4 [Docket Text # 51].)

### 3.  October 14, 2003 Subpoenas

Allegedly concerned that Defendants had not fully complied with prior subpoenas, on October 14, 2003, the government issued two more subpoenas commanding the production of many of the same records previously sought "for the period January 1, 1996 to present." (Pl.'s Resp., Ex. C [Docket Text # 51].)

On January 22, 2004, Defendants responded to the subpoenas and delivered various documents memorialized in a letter from defense counsel dated January 23, 2004. (*Id.*, Ex. D.)

### 4.  July 22, 2004 Subpoenas

According to the government, by the spring of 2004 it had been made aware of ICR's use of the JENKON system and its ability to store data related to ICR's business operations. On July 22, 2004, two more subpoenas were issued commanding information that allegedly would have been contained in the JENKON system. Although the JENKON system was not specifically mentioned by name, the subpoena commanded that "[a]ny and all records regarding ... representatives ... *in whatever form found* for the period January 1996 to the present." (Pl.'s Resp., Ex. E (emphasis added).)

By the time the July 22, 2004 subpoenas were served, the government informed defense counsel that it was aware of ICR's use of the JENKON system and the type of

information contained therein. (*Id.* at 6.) At some point between July 22, 2004 and July 26, 2004, Defendant Renzi received a phone call from defense counsel informing him that the government was demanding that Defendants produce the JENKON system. (Evid. Hr'g Tr. at 74, Feb. 21, 2007.) Renzi thereafter instructed Ian Bible, ICR's network administrator, to remove three COMPAQ hard drives containing the programs and data files for the JENKON system (JENKON disks). According to Bible, he warned Renzi "that the system would not work anymore without those drives, and then anybody trying to recover data off them, because of the way the drivers were set up, it would be difficult in doing ... [Renzi responded] that nobody was using it anyway so just go ahead and pull it."[3]

---

[3] Although Renzi denies that Bible ever provided him with such a warning, the record demonstrates that the integrity of the data on the JENKON disks may have been compromised, in part, due to Defendants' own actions. (Evid. Hr'g Tr. at 92, Feb. 21, 2007.) At the February 21, 2007 evidentiary hearing, Renzi testified:

> Q: You said you took the hard drives out or had the hard drives taken out of the server?
> A: Correct.
> Q: You were there when that happened.
> A: Yes.
> Q: And you know the effect of taking hard drives out of the server, don't you?
> A: Yes.
> Q: You can damage or make it impossible to gain access to the information on those hard drives, is that correct?
> A: It's correct that if you pick up a computer –
> Q: Yes or no, is that correct?
> A: It's possible, yes.
> Q: And you were told that by Ian Bible before you took the hard drives out?
> A: No, I was not.
> Q: He wasn't telling the truth when he said that you warned him not to take them out and destroy the array or hurt the array?
> A: When I asked Mr. Bible to retrieve the hard drives for me, he did not indicate any concern at all.
> Q: But as a computer –
> A: And –
> Q: I'm sorry, continue.
> A: And it's important to note that when you take a hard drive out of a

computer, if you simply pick up a computer and put it in a car, there's no greater risk to the hard drives than taking them out and putting them in a car. Any time you move a –

Q: If you have the server they came out of, is that correct?

A: If I had the server –

Q: They came out of and you knew what the RAID array was.

A: I'm sorry, that's a different question. In terms of damaging the system, if you take them out of the server, there's no greater risk of damaging the hard drives than carrying the server itself. But taking them out in terms of the ability to read the information, not damage the hard drives, but in terms of being able to read the information on there, is that the question or –

Q: That's the question.

A: Okay. I'm sorry, what is the question, if you –

Q: You knew that taking the hard drives out of this server would make it difficult or impossible for someone else to read the data on the hard drives.

A: I knew that if you had the original server it would be easier to read the data on the hard drives, yes.

Q: Did you give the original server to the government with the hard drives?

A: No, I did not.

(Evid. Hr'g Tr. at 92-93, Feb. 21, 2007.) Renzi further testified:

Q: Did you ever offer to bring the server over when you knew there was a problem [reading the data on the JENKON disks]?

A: I offered to bring whatever assistance I could up until the time I received the copies.

Q: Did you ever offer, without being asked, to provide the server that the hard drives were taken out of?

A: In terms of the language used, I offered to provide whatever assistance the government asked for.

Q: That's not what I asked, Mr. Renzi. I asked you –

A: I know what you asked.

Q: I asked have you ever said, that – offered, when you knew there was a problem, to provide the original server to the government?

A: The way I would like to answer that is when I say I would offer any assistance, I would include the server in that offer. But in terms of spelling out whether I offered to bring the server or the keyboard or anything else, I did not break down what the offer included.

Q: You didn't bring or provide the server until you were requested to by the government, is that correct?

A: That is correct.

(Evid. Hr'g Tr. at 107-108, Feb. 21, 2007.)

At the March 30, 2010 hearing on the instant motion, defense counsel stated that they were unaware that there had ever been any suggestion that Defendants had responsibility for compromising the integrity of the JENKON disks. Defense counsel Martin

Crandall stated on the record:

> MR. CRANDALL: ... and we didn't hear until last week that it might have been damaged by our complicity when it was removed from the Jenkon server.
>
> THE COURT: Wait a minute. I knew – I mean, I heard from Mr. Bible when he testified, what, two years ago.
>
> MR. CRANDALL: Three years ago, he testified.
>
> THE COURT: Whenever it was he testified, however long ago it was, that that was his opinion at that time. So how could you not have heard a couple weeks ago?
>
> MR. CRANDALL: Only last week was the very first time it was said in the courtroom that we had complicity in it being damaged.
>
> THE COURT: How did I hear if you didn't hear? You didn't hear that from Mr. Bible? I mean, I have his testimony, I have my notes of his testimony.
>
> MR. CRANDALL: Well, whatever he testified to I'm not going to argue with the Court about right now, but I can tell you the first I heard of that was last week ...

(Evid. Hr'g Tr. at 23-24, Mar. 30, 2010.) Defense counsel Richard Helfrick stated on the record:

> MR. HELFRICK: Your Honor, for the record, I've read Mr. Bible's testimony over the weekend twice, and he never testified that he told anyone that removing those hard drives would damage them. It's not there. It's not in the testimony.
>
> THE COURT: Okay. I'll look again.
>
> MR. HELFRICK: I'm just saying, I read it twice over the weekend because you brought it up when we were here last week, and it's just not there.

(Evid. Hr'g Tr. at 24, Mar. 30, 2010.)

The contention that Defendants' complicity may have compromised the integrity of the JENKON disks was not only explored at the February 20-21, 2007 evidentiary hearing, but was also argued by the government in its various responses to Defendants' motions to dismiss the Indictment.

For example, in the government's response filed on April 3, 2006—almost one year prior to the February 2007 hearing—the government argued that "Renzi took possession of the hard drives after ordering an employee to take them out of the server. The employee warned Renzi that the system might not work again if the hard drives were removed from the server as JENKON was a RAID system. The employee also warned Renzi that there would be difficulties in accessing data if the hard drives were not left in the server and put in proper sequence. Rather than turning the hard drives over in the server, Renzi ignored the warnings and told the employee to take the hard drives out anyway, which he did." (Pl.'s Resp. at 6 [Docket Text # 51].) The government also contended that "Renzi's reckless treatment of the hard drives ... at the very least belies the claim that the data is 'critical exculpatory and impeaching information' and at most is evidence of obstruction of justice." (*Id.* at 20-21.) Further, the government argued: "The government did not destroy evidence. If the hard drives are inaccessible as a result of some overt act and not some natural

(Evid. Hr'g Tr. at 141, Feb. 20, 2007.) Bible then removed the JENKON disks and gave them to Renzi.[4]

On July 26, 2004, Renzi delivered the JENKON disks to FBI Special Agent Mark Benston. (Evid. Hr'g Tr. at 75, Feb. 21, 2007.) Prior to this date—and, as discussed below, despite Defendants' current contention as to the extent of the information contained on the JENKON disks and despite the fact that Defendants regularly relied upon printed reports generated from the JENKON system to conduct the daily business operations of ICR—almost no documents or reports generated from the JENKON system was ever produced to the government.[5]

## C. Accessibility of JENKON Disks

According to Defendants, at the time the JENKON disks were delivered to the government they were operational and accessible. The government, on the other hand,

---

mechanical failure due to age, it is more likely that it was caused by the defendants' own actions." (*Id.* at 25.)

Additionally, in the government's response to the instant motion filed on October 5, 2009, it argued that "it appears that Todd Renzi knew he was compromising the original hard drives when he ordered them taken out of the original server. ... When Renzi ordered Ian Bible to take the hard drives out of the server in response to the government's subpoena, Bible warned him they would not work if he took them out." (Pl.'s Resp. at 15-16 [Docket Text # 101].) The government also claimed that "[w]hatever damage was done to the original hard drives is far more likely to have been caused by Todd Renzi's reckless or intentional disregard for their integrity when he ordered Ian Bible to remove them from the original server." (*Id.* at 17.)

[4] Defense witness Patrick Comeaux's testimony, at the March 30, 2010 hearing, does not change this Court's analysis.

[5] The government acknowledges that one list—that appears to be a JENKON document—of ICR representatives was produced in June 2000.

contends that it has "never ... been able to open or access data on the JENKON system." (Pl.'s Resp. at 9 [Docket Text # 51].)

The JENKON disks were sent to the Michigan State Police (MSP) to have a forensic software program "image" the files. (Pl.'s Resp. to Defs.' Mot. for Disc. at 2 [Docket Text # 35].) On November 9, 2004, the MSP "imaged" the JENKON disks using a DOS boot CD and Encase v4.20.

> Each of the [JENKON disks] was imaged using a forensic stand-alone system and no errors were reported during the imaging process.
>
> The integrity of each image was checked after all imaging was complete.

(Defs.' Mot., Ex. A [Docket Text # 100].) The images were also copied onto two forensic hard drives.

On November 15, 2004, one of the two copies of the JENKON disks—reproduced by the MSP on November 9, 2004—was provided to Defendants (First Copy). According to Defendants, the copy of the JENKON disks that they were provided, the First Copy, was not operational nor accessible.

Because of the difficulty in reading the JENKON disks, the original and the copy retained by the government (Second Copy) were sent, on February 24, 2005, to the corporate offices of Jenkon International. The Jenkon International employees were "unable to [open the files] because they felt it was necessary to have the server that the software had been used on, and [the government] did not have that server having not subpoenaed it at that point." (Tr. from Continued Hr'g on Defs.' Mot for Disc. Re: JENKON Disk at 6 [Docket Text # 39].)

On April 18, 2005, Defendants filed a motion for return of property specifically requesting the return of the original JENKON disks. [Docket Text # 27.]

On May 19, 2005, the original JENKON disks were returned to Defendants. According to Defendants, the original JENKON disks—like the First Copy—were not operational nor accessible.

On July 14, 2005, Defendants filed a motion for discovery "re: JENKON disk." [Docket Text # 33.] In that motion, Defendants requested the Court to order the Government to produce:

> a) The Chain of Evidence from the time the JENKON disk(s) were provided pursuant to the Grand Jury subpoena;
>
> b) Copy of any "E" files which were created from the disks;
>
> c) Name of any software that was used for forensic imaging; and
>
> d) Copies of any documents or information from the JENKON disk(s) that the government intends to use at trial.

(Defs.' Mot. for Disc. at 1-2 [Docket Text # 33].)

A hearing on Defendants' motion for discovery "re: JENKON disk" was conducted on July 20, 2005. At the hearing, the government offered to assist Defendants in opening and retrieving the information on the JENKON disks.

> If [Defendants] want to go to Michigan State Police and have their copy [of the JENKON disks] opened and review it and have copies made of what's on it, if they can't open theirs, then we will make that available. ... If they still can't open it, they can't make it work, then they're welcome to go up [to the Michigan State Police] and we'll make that happen.
>
> If they want to have our experts open that copy to the best of their ability and give them the information on it, we will give it to them. ...
>
> If you can't pull [the information] off the hard drive yourself, we'll get if off and you can have it.

(Tr. from Hr'g on Defs.' Mot for Disc. Re: JENKON Disk at 14-17 [Docket Text # 38]). In an Order, dated July 21, 2005, the Court also provided that "if Defendants want the Michigan State Police to attempt to open and retrieve information on the GENKON [sic] hard drive, then the Defendants are to notify the Government of that fact as soon as possible." [Docket Text # 36.]

Again, on August 25, 2005, at a continued hearing on Defendants' motion for discovery, the government represented that "the Michigan State Police experts who made the copies of the [JENKON disks] feel confident that they can open it" if Defendants provide the server, which they agreed to do. (Tr. from Continued Hr'g on Defs.' Mot for Disc. Re: JENKON Disk at 6-7 [Docket Text # 39]).

> MSP has copied, imaged the original [JENKON disks], but has not opened it. [The MSP] believe ... they can open [the JENKON disks] if they have the server that it was used in.

(*Id.* at 17.) At that time, the Court gave the government "two weeks to get [the JENKON disks] open, let [Defendants] see it, and if there's a problem," the parties could return to the Court. (*Id.* at 20.)

On September 9, 2005, Defendant Renzi went to the FBI offices in East Lansing, Michigan and provided the MSP the original JENKON disks, the server that it was used in, and the First Copy that had been previously provided to Defendants. According to Defendants, the MSP was unable to access the information on either the original JENKON disks or the First Copy.

The Michigan State Police officers indicated at that meeting that when they had received the original JENKON disks they were able to access the disks[6] and make copies. The officers also indicated that they had accessed the copies before returning them and the originals to the FBI. During the meeting the officers tried to access the original JENKON disks on their equipment and determined that two of the three disks were bad and the information on the disks could not be obtained from them.

(Defs.' Mot. at 3 [Docket Text # 100].)

On October 5, 2005, the FBI contracted J. Bryan LeGwin of Computer Data Recovery (CDR) to assist in the recovery of the information contained in the copy of the JENKON disks that it retained (the Second Copy). No information, however, was recovered off the Second Copy. This was due to a suspected "severe 'head 'crash' which happens when the read/write head drag on the surface of the HDD data platters. ... This type of damage rules out any recovery possibility as the magnetic material that holds that data has been

---

[6] Defendants' use of the word "access" here is misleading. According to the government, neither it nor anyone acting on its behalf has ever been able to retrieve data from the JENKON disks. (*See* Pl.'s Resp. at 9, 21 [Docket Text # 51] ("[the government] has never ... been able to open or access data on the JENKON system").) Renzi testified that the MSP computer experts stated that the hard drives were mechanically functioning properly, and he specifically testified that he did not hear the MSP computer experts state that they actually tried to look and see what was on the hard drives. (Evid. Hr'g Tr. at 106, Feb. 21, 2007.)

> Q: Mr. Renzi, there's a big difference between mirror imaging a hard drive and being able to access the information, is that correct?
> A: Yes, that's correct.
> Q: Has anybody ever told you they were able to access the information on Jenkon?
> A: Yes, they did.
> Q: Who told you that?
> A: I believe I heard it in court.
> Q: Do you know, have you heard from any of the computer experts that looked at Jenkon that they were able to access it?
> A: I heard from the computer experts that the hard drives were working properly. I did not hear that they were actually trying to look and see what was on the hard drive.

(Evid. Hr'g Tr. at 105-106, Feb. 21, 2007.)

damaged beyond repair." (Defs.' Mot., Ex. D at 4 [Docket Text # 100].) LeGwin opined that the "data loss [was] not caused by error or omission [nor was] it caused by neglect or improper procedure. [The] catastrophic failure [was] caused by mechanical and electronic failure alone and is not related to the operator or the process used by the operator to recover, copy or access the drive data." (*Id.* at 8.)

On November 14, 2005, Renzi and his attorney went to the offices of CDR and brought with them the First Copy, the original JENKON disks and the server.

> LeGwin was unable to access data on this copy and asked the defense if he could open the hard drive [of the First Copy] to see what the cause of the failure was. His request was refused. LeGwin said that he would have been surprised to see the same damage on both copies, but because he was told not to open the [First Copy] ... he does not know if the damage was the same.
>
> Renzi specifically asked LeGwin whether the damage was done intentionally and LeGwin said in his opinion it was not.

(Pl.'s Resp. at 22 [Docket Text # 51].)

On November 14, 2005, LeGwin also requested that he be permitted to examine the original JENKON disks, which were in the custody of Defendants.

> LeGwin told the defense he thought there was a good chance he could access the data on the original, but because he would be examining original evidence he asked that the government obtain an order from this court allowing him to perform the examination with witnesses from both sides observing.
>
> LeGwin's concerns were that in accessing the original hard drives the computer would change modification and access dates for some of the operating files. This would in no way change the substantive data on the hard drive, but in an effort to maintain the integrity of the process and the original evidence itself, he wanted to cover all the bases.

(Pl.'s Resp. at 22 [Docket Text # 51].) It is not clear from the record why neither party filed a motion to request this Court's authorization to permit LeGwin's further investigation. LeGwin did not generate a report of his findings.

### D. Original Motion to Dismiss the Indictment [Docket Text # 48]

On March 16, 2006, Defendants filed a motion to dismiss the Indictment claiming the government had intentionally destroyed the JENKON disks: evidence which was material to their defense, "irreplaceable evidence that directly refutes allegations in the Indictment." (Defs.' Mot. at 3 [Docket Text # 100].) Specifically, Defendants claim that the JENKON disks contained records relating to the suspension, termination and reprimand of ICR's representatives that had engaged in unauthorized behavior,[7] and that the JENKON disks are the only place this information exists.[8]

---

[7] According to Defendants, "Jenkon contained memorializations of ICR communications with representatives who would engage in unauthorized, non-compliant advertisements in Yellow Pages, local papers, billboards, business cards, etc.; the ICR representative support staff documented their reprimands and their confirmations with representatives to correct such advertisements, to retrieve the offending materials and cease and desist from future non-compliant behavior; Jenkon contained memorializations of ICR communications about representatives who were reported to have stolen customer's money; Jenkon contained memorializations of ICR communications between the representative support managers or ICR's Fraud Department and suspended or terminated representatives, who were suspended and/or terminated for making false, misleading advertisements and/or false statements, representations and/or promises to customers and/or 'downline' representatives." (Defs.' Joint Supp. Memorandum in Support of Def.'s Mot. to Dismiss at 10 [Docket Text # 67].)

[8] According to Defendants, "Jenkon was the program used to manage the representatives' activities and behavior, and it is the only source of such collective information that could be used to refute and rebut the indictment allegations and refute representatives' statements and prove their reprimands, suspensions and terminations in regards to counts listed in the indictment." (Defs.' Joint Supp. Memorandum in Support of Def.'s Mot. to Dismiss at 11 [Docket Text # 67].)

> Because the core of the indictment alleges a systemic corporate fraud, ostensibly perpetuated by defendants, involving fraudulent statements, promises and representations, made to the company's representatives, defendants access to Jenkon's stored communications with representatives which directly refute the indictment's allegations conclusively demonstrates that Jenkon constitutes materially exculpable evidence.

(Defs.' Joint Supp. Memorandum in Support of Def.'s Mot. to Dismiss at 10-11 [Docket Text # 67].)

On April 3, 2006, the government filed a response to Defendants' March 16, 2006 motion. [Docket Text # 51.]

On April 17, 2006, Defendants filed a reply. [Docket Text # 52.]

Ten months later, on February 16, 2007, Defendants' filed a supplemental brief to its March 16, 2006 motion to dismiss. [Docket Text # 67.]

On February 20-21, 2007, an evidentiary hearing on that motion was held.

### E. Discovery of the JENKON Back-up

Based on testimony provided at the February 20-21, 2007 evidentiary hearing, the government believed that evidence related to the underlying mail fraud charges in the Indictment could be found at National Credit Processing (NCP), a business owned and operated by Richard "Enzo" Pavone (cousin of Bernadino Pavone and nephew of Gloria Tactac), located in the Livonia Mall at 29640 Seven Mile Road, Livonia, Michigan. On February 22, 2007, a search warrant was executed at NCP. Among the other items seized was a cassette tape that is alleged to be a back-up tape for the JENKON disks (Back-Up).[9]

---

[9] According to the government, the Back-Up "was found tossed in a box on a corner self in a back room at NCP. The fact of it's existence alone flies in the face of the defendants' relentless claims that they had no access to JENKON data due to the government's intentional destruction of evidence." (Pls.' Resp. at 3 [Docket Text # 101].)

The parties, however, have disputed whether the tape is in fact a complete back-up of the JENKON disks or whether is it only a partial back-up.

On December 11, 2007, Defendants filed a joint *ex parte* submission of a proposed budget for computer/software expert fees and expenses that may be incurred in order to resolve Defendants' outstanding motion to dismiss the Indictment. [Docket Text # 89.]

> Subsequent to several hearings regarding Defendants' Joint Motion to Dismiss, the Government executed a Search Warrant and claims to have located a Jenkon back-up tape. The Government has sent the "Jenkon back-up tape" to the Jenkon software producer's corporate offices in Vancouver, Washington to Jenkon employee, Ms. Sherri Meade. Based upon Ms. Meade's efforts, it is now the Government's position, although not clearly articulated in any Court pleading, that this "Jenkon back-up tape" contains the same or identical information contained on the original ICR Services' Jenkon disks and server.
>
> It is now necessary for Defendants to retain an expert who specializes in computer and computer software, especially the Jenkon software program, to examine the "Jenkon back-up tape" and render an opinion as to whether or not the "Jenkon back-up tape" is, in fact, an identical (or near identical) back-up tape of the original Jenkon program and server.

(*Id.* at 3.)

On January 23, 2008, the Court granted Defendants' joint *ex parte* submission of a proposed budget for computer/software expert fees and expenses. [Docket Text # 91.] The Court also authorized an additional advance on March 19, 2009. [Docket Text # 95.]

On October 6, 2008 and June 10, 2009, Defendants' expert, Jay Leisner of Sylvina Consulting, issued two forensic computer software reports.

> Mr. Leisner's task, essentially, was to examine the [Back-Up] ... the Government seized ... from [NCP]. It was Mr. Leisner's task to confirm or disprove the Government's assertion that it had located an identical back-up tape of the original Jenkon server disks which, since the Government's seizure, are no longer accessible. Mr. Leisner's forensic task was most challenging because without the original operational Jenkon disks, a simple comparative analysis was not possible. Accordingly, Mr. Leisner solicited

defense counsel and defendants to pose questions to which Mr. Leisner could seek the answers. If the questions were carefully crafted, then the answers attained would likely produce a determination of whether the supposed back-up tape was, in fact, an identical back-up to the original Jenkon disks.

(Defs.' Mot. at 6 [Docket Text # 100].) Defendants posed the following question to Leisner:

1. Is the Jenkon back-up tape actually a Jenkon program?

2. Is the Jenkon back-up tape a complete copy or back-up of a Jenkon server?

3. Is the Jenkon back-up tape a copy of ICR's Jenkon server, or does it appear to have some of their files, but not the complete back-up?

4. Does it contain any of the program customizations that Mr. Leisner previously installed for ICR Services?

5. Does the Jenkon back-up tape provide any screen shots of the comment screen section?

6. Is there an audit file and what information does the audit file contain?

(Defs.' Joint Ex Parte Mot. at 3-4 [Docket Text # 89].)

7. Is there consistency throughout the years or does there appear to be blocks of missing years or dramatically less activity?

8. Does there appear to be any "fake" data, or data that would appear in the Training version, such as "TEST" Reps or Customers, or Reps or Customers with the Social Security Number "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" or "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"?

9. Do the comments have both the comment code and the comments themselves?

10. Does the comment screen show incoming and outgoing phone calls being logged in the system with dates and employee initials so that you could reference any communication between corporate and the Reps in the field?

11. Does the comment screen show how the Reps were trained on the product, process, guarantee, insurance, advertising, etc., which employee trained them, the materials that were covered and the outcome of the communication?

12. Does the comment screen show representatives who were <u>warned</u>, <u>reprimanded</u> or <u>suspended</u> for misrepresenting the product, process, guarantee, insurance, or for false, misleading or unapproved advertising?

13. Does the comment screen show if the Reps responded to the warning, reprimand or suspension, if they called after that, what was said and how the situation was handled?

14. Does the comment screen show Representatives who were <u>terminated</u> for misrepresenting the product, process, guarantee, insurance or for false, misleading or unapproved advertising?

15. Does the comment screen show if the Reps did not respond to their termination if their response was not what the company needed to reinstate the Rep or how the situation was handled moving forward?

(Pl.'s Resp., Ex. 2 at 1-2 [Docket Text # 101].)

[16.] For the 95 total records of suspended and/or terminated representatives you found on the program you reviewed, please provide either their comment screens ... or let us know there are none, for each record.

[17.] For the 95 total records of suspended and/or terminated representatives you found on the program you reviewed, what is the range for the date they were suspended and/or terminated from earliest to latest? ...

[18.] Can you confirm whether an individual could change or delete information/data in the Jenkon system ... without a trace or an audit trail revealing such changes/deletions? ...

[19.] What level of access to ICR's Jenkon system would an individual need to have to make changes to the comment screens? Was ICR's "original" Jenkon program set-up/programmed to leave an audit trail when comments ... were added, deleted, changed or modified?

[20.] Provide the comment screens of William Swartz ..., Nylla Swartz ..., George Cole ..., Harmik Poghossian ... and Timothy Baise.

(Leisner's June 10, 2009 Report at 1.)

According to Defendants, Leisner's reports "render[] a compelling determination that

the [Back-Up] ... is not complete (nor near-complete) copy of the ICR [JENKON] disks as

18

they were when originally surrendered to the Government." (Defs.' Mot. at 7 [Docket Text

# 100].) Defendants, in their motion, summarized Leisner's conclusions as follows:

A. ... Mr. Leisner could not determine conclusively whether or not the tape he reviewed was the same as the original Jenkon disks.

B. Specifically, Mr. Leisner did not find any suspended or terminated ICR representatives from the time Jenkon was purchased by ICR in 1998 until February 15, 2000.

C. Originally, ICR purchased the Security Module from Jenkon. The Security Module allowed ICR to establish passwords for various modules or features of the software, in order to restrict certain users from certain information modules. While available, Mr. Leisner found no password protection or other security features utilized in the Jenkon program he reviewed, which stands in stark contrast to ICR's original Jenkon disks. In other words, there were no password restrictions put in place in the program Mr. Leisner reviewed for any modules or features within the program.

D. The audit feature in Jenkon allows users with proper access to track when certain files are modified or deleted. After reviewing the program, Mr. Leisner concluded that he could find no evidence that the program was configured to audit changes to the comment fields in the distributor file. Therefore, if anyone changed or deleted any comments or any data in the ICR representative field, it could not be determined. No one would be aware that changes were made, nor who made them, nor when they were changed. Also, the audit data file that was in the program Mr. Leisner reviewed could have been changed or deleted by any person by simply running a utility program that appeared on the distributor utility program's menu, which was not password or security protected.

E. Of the four (4) individual identification records, Mr. Leisner was requested to review from the comments screens, all of them, except George Cole's, displayed as ICR Legal Care Fund. George Cole's came up as George Cole. Of all four (4) of the comment screens that Mr. Leisner printed, none of the comments stated or showed that these individuals were reprimanded, suspended or terminated.

F. When Mr. Leisner searched for records of Timothy Baise, he found three (3) records, each of which had an "R" code, which meant it was for a retail customer. Mr. Leisner did not find any record for Timothy Baise as an ICR distributor.

(*Id.* at 6-7.) Based on the position that the Back-Up is, at best, an incomplete version of the JENKON disks, Defendants renewed their motion to dismiss.

### F. Renewed Motion to Dismiss the Indictment [Docket Text # 100]

On September 11, 2009, Defendants filed a renewed motion to dismiss, under the provisions of Federal Rule of Criminal Procedure 12(b)(2), contending that the government destroyed evidence "critical and necessary" for their defense. [Docket Text # 100.] Defendants maintain that the JENKON disks are material and necessary to their constitutional ability to mount an effective defense, and that there is reasonable probability that such evidence could result in a different outcome at trial.

## II. Analysis

Defendants, in their renewed motion, argue that the Indictment should be dismissed because the government's destruction of the JENKON disks has caused substantial prejudice as it will prevent them from receiving a fair trial, including a verdict worthy of confidence. Specifically, Defendants claim that JENKON was used to store detailed information relating to suspended or terminated ICR representatives,[10] and Defendants also claim that the data contained on the Back-Up is incomplete as the materially exculpatory and impeachment evidence allegedly contained in JENKON had either been: (1) entered

---

[10] As discussed below, and contrary to Defendants' assertions, the evidence does not demonstrate that *detailed* records of representatives who were suspended, terminated or reprimanded were stored in the JENKON system. In particular, the testimony of Bates, Griffin, and Austin reveals that records of employee disciplinary actions were kept in hard copy files in Bates' office. Although Defendants refer to numerous instances where witnesses testified that the JENKON system contained notes relating to disciplinary action taken against representatives, when this testimony is read in its entirety, it shows that only infrequent and brief notes might be found in the JENKON system, whereas detailed information was maintained elsewhere.

after the Back-Up was run (between February 11, 2004 and July 26, 2004); (2) deleted from the Back-Up; or (3) was otherwise incomplete.[11] Because Defendants claim that this information is critical to their defense, Defendants' conclude dismissal is warranted. The government, on the other hand, contends that Defendants are simply attempting to take advantage of the apparent inaccessibility of the JENKON data to misstate and exaggerate both its nature and value.[12]

### A. Disclosure of Impeachment Evidence

In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held that the government's failure to assist the defense by disclosing information that might have been helpful in conducting cross-examination amounts to a constitutional violation only if it deprives the defendant of a fair trial. The Court went on to hold that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is *material*." *Id.* at 678 (emphasis added). The Court defined "materiality" by stating that:

---

[11] For example, a review of Defendants' expert witness report shows that he was asked to search, by name, for records relating to various suspended or terminated representatives. Because no records were found, Defendants conclude that the data is incomplete. However, witnesses called at the February 20-21, 2007 evidentiary hearing consistently testified that when a representative was terminated the representative's identifying information was changed to either "ICR Charities" or "ICR Legal Care Fund" and their information could not be accessed by name. In order to access the old information the searcher would need the representative's identification number, not their name.

[12] According to the government, Defendants have known since at least May 2000 that they were under investigation and the government also claims that it stains all credulity to believe that four years later they turned over, in such an apparently reckless manner, the only form in which their entire defense rests without backing up the system (which Defendants had the capacity to do) and without generating hard copies of the data contained therein (which the JENKON system had the capability to do). The government argues that this is especially true given the fact that Defendants' employees backed up the system regularly and given the fact that Defendants themselves routinely relied upon printed reports generated by the JENKON system.

21

nondisclosed evidence ... is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 668.

The government contends, and this Court agrees, that Defendants "have failed on all accounts to meet their burden on this issue. There is no evidence that the government has failed to turn over or make unavailable impeachment information and no showing that any otherwise unavailable evidence was material or that there is a reasonable probability that, even if it existed was of such importance that it would 'undermine confidence in the outcome.'" (Pl.'s Resp. at 17 [Docket Text # 101].) Moreover, Defendants' "argument should fail because they have not proven: first, that exculpatory information exists ... on the JENKON system, and second, if it exists ... [that] JENKON is the only place it can be found." (Pl.'s Resp. at 29 [Docket Text # 51].)

## B. Destruction of Evidence[13]

---

[13] Defendants, in their reply brief, direct the Court to a concurring opinion in *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979) (*en banc*) (Kennedy, C.J., concurring), *cert. denied*, 445 U.S. 917 (1980), *reversed on other grounds*, 474 U.S. 302, *overruled on other grounds*, *United States v. Grace*, 526 F.3d 499 (2008), for the proposition that a balancing test should be applied where the government loses or destroys criminal evidence. However, as recognized by Judge Cox, in *United States v. Culberson*, No. 05-80972, 2007 WL 1266131, at *3 (E.D. Mich. Apr. 27, 2007), "this case is not binding on the Court and Defendants do not cite any Sixth Circuit authority applying a similar test."

In *Loud Hawk*, the defendants were fugitives from a recent incident. They were spotted by federal authorities traveling in Oregon. The authorities sent a teletype message to Oregon law enforcement describing the vehicle. An Oregon state trooper saw the vehicle and stopped it the next day on the basis of the information contained in the teletype. The state authorities conducted a search of the defendants vehicles with federal authorities present, although the federal authorities did not participate in the search. However, the federal authorities did take a photograph of dynamite found in the vehicle. The federal authorities did not request the state authorities retain

In *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the Supreme Court held "that

unless a criminal defendant can show bad faith on the part of the police, failure to preserve

> any of the dynamite and it was subsequently destroyed by the state
> authorities.
> The defendants were charged, among other things, with three counts
> pertaining to the dynamite. The government sought to offer photographs of
> the dynamite. The district court dismissed the dynamite counts on grounds
> of unlawful suppression of evidence. The court stated that when the
> government loses or destroys tangible evidence prior to trial, secondary
> evidence will be suppressed if the defendant can show bad faith and that he
> was prejudiced.

*Culberson*, 2007 WL 1266131, at *3-4 (internal citation omitted). Here, Defendants have
failed to establish bad faith. A concurring opinion in *Loud Hawk*, however, created a
different test:

> The proper balance is that between the quality of the Government's conduct
> and the degree of prejudice to the accused. The Government bears the
> burden of justifying its conduct and the defendant bears the burden of
> demonstrating prejudice. In weighing the conduct of the Government, the
> court should inquire whether the evidence was lost or destroyed while in its
> custody, whether the Government acted in disregard for the interests of the
> accused, whether it was negligent in failing to adhere to established and
> reasonable standards of care for police and prosecutorial functions, and, if
> the acts were deliberate, whether they were taken in good faith or with
> reasonable justification. ...
> Against all this must be weighed the degree of prejudice to the defendant. In
> analyzing prejudice, the court must consider a wide number of factors
> including, without limitation, the centrality of the evidence to the case and its
> importance in establishing elements of the crime or the motive or intent of the
> defendant; the probative value and reliability of the secondary or substitute
> evidence; the nature and probable weight of factual inferences or other
> demonstrations and kinds of proof allegedly lost to the accused; the probable
> effect on the jury from absence of the evidence, including dangers of
> unfounded speculation and bias that might result to the defendant if adequate
> presentation of the case requires explanation about the missing evidence.

*Loud Hawk*, 628 F.2d at 1152. The government has not addressed this case, as it was first
cited by Defendants in their reply brief. Nevertheless, even if this Court were to adopt this
balancing test, Defendants' motion would still be denied: for the reasons stated in this
Opinion, the degree of prejudice to Defendants does not outweigh the quality of the
governments conduct.

potentially useful evidence does not constitute a denial of due process of law." Here, the Court finds that there is no evidence of bad faith on the part of the government.

In *California v. Trombetta*, 467 U.S. 479 (1984), the Court established a separate test for determining whether the government's failure to preserve evidence rises to the level of a due process violation in cases where "material exculpatory" evidence is not accessible, as opposed to cases where "potentially useful" evidence is not accessible. The Court held that the government violates a defendant's due process rights where "material exculpatory" evidence is not preserved, regardless of whether the government acted in bad faith. *Id.* at 489. However, for evidence to meet the standard of constitutional materiality, it "must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488-89. *Cf. United States v. Wright*, 260 F.3d 568 (6th Cir. 2001).

The government contends that Defendants "have failed to show that information, particularly that relating to suspended or terminated representatives, ever existed in the JENKON system. ... Whatever damage was done to the original hard drives is far more likely to have been caused by Todd Renzi's reckless or intentional disregard for their integrity when he ordered Ian Bible to remove them from the original server." (Pl.'s Resp. at 17 [Docket Text # 101].) The government also contends that "[i]t strains credulity to believe that JENKON data stored variously in; a hard drive stored in a back room on a shelf, a back up tape tossed in a box in a storage room, and in back-up tapes that have mysteriously disappeared from a fire proof safe, are critical and necessary to the defendants' defense. Clearly they are not and clearly they never have been. The lack of

specificity in defendants' claim about the exculpatory value of the purportedly unavailable evidence by itself makes their argument specious." (Pl.'s Resp. at 18 [Docket Text # 101].) Moreover, "[w]hat is even more clear is that whatever information was contained in the hard drives turned over to the government has been, in several different forms, in the defendants' possession and control all along." (*Id.*)

Here, the evidence does not meet the standard of constitutional materiality—it has not been established that the JENKON disks possessed the requisite exculpatory value that was apparent before they were destroyed nor has it been established that the JENKON disks were of such nature that Defendants would be unable to obtain comparable evidence by other reasonably available means.

### C. Alternate Sources of Information

A review of the testimony taken at the February 20-21, 2007 evidentiary hearing reveals that there were at least four other sources of data, allegedly contained only on the JENKON disks, available to Defendants after the JENKON disks were turned over to the government. Those four sources include: (1) the Back-Up tape seized in the execution of the search warrant; (2) hard paper copies—the Bates files; (3) the JENKON I server; and (4) and a system of backup tapes maintained in an office assigned to Defendant Renzi, John Canzoneri and Ian Bible. The Court next addresses two of those sources: the back up tape seized on February 22, 2007 and the hard paper copies (the Bates files).

### 1. Back-Up Tape Seized on February 22, 2007

The parties are in dispute as to whether the Back-Up is in fact a complete back-up of the JENKON disks. Defendants claim that the Back-Up contains incomplete

information—as it only contains a back-up of an earlier version of their Jenkon system (JENKON I), that was only used and backed up through the end of 2002. Specifically, Defendants claim that the Back-Up "does not include information regarding ICR's representatives from 2002 until July 26, 2004, [the date that] Mr. Renzi turned over to Special Agent Mark Benston the three hard drives that contained the software programs and data files for the JENKON program (JENKON II). Defendants also contend that the alleged tape of JENKON I is really Ian Bible's laptop or a personal computer from his office." (Defs.' Mot. at 4 [Docket Text # 100].) Defendants' contentions, however, are directly contradicted by its own expert's report: Leisner's report demonstrates that the Back-Up contained data well beyond November 2002—the date that ICR replaced JENKON I with JENKON II. (*See* Evid. Hr'g Tr. at 53-54, Feb. 20, 2007.)

After accessing and evaluating the Back-Up, Leisner concluded that, at least through November 7, 2003, the Back-Up represented a complete copy of the JENKON disks. Leisner, however, expressed some reservations about the completeness of the Back-Up for the period between November 7, 2003 and February 11, 2004. In response to the question: "Is the Jenkon back-up tape a copy of ICR's Jenkon server, or does it appear to have some of their files, but not the complete back-up?", Leisner responded:

> It depends. ... If ICR Services did not process commission runs on its business for the months of November 2003, December 2003, and January 2004 and did not import customers and distributors from the OTG software either, I would say that it appears that the hard drive contained a complete set of files as of February 11, 2004. However, it would be hard for me to understand how ICR Services could stay in business beyond November 2003 if it had NOT been calculating and paying commissions.

(Pl.'s Resp., Ex. 2 at 18-19 [Docket Text # 101].) Finally, there was no indication of any data beyond February 11, 2004.[14] Leisner's conclusions are consistent with the testimony of Sue Griffin. (Evid. Hr'g Tr. at 46-53, Feb. 20, 2007.)

Griffin testified that she was employed by ICR between 1997 and January 2004 with bookkeeping, payroll (commission check issuance), customer service and representative support responsibilities. (Evid. Hr'g Tr. at 46-47, Feb. 20, 2007.) Griffin operated, and was primarily responsible for, the JENKON system—which processed commissions, tracked orders, and documented the multi-level marketing genealogy—from the fall of 1998 until October 2003. (*Id.* at 48-49.) According to Griffin, ICR discontinued its use of the JENKON system in October 2003 when a new compensation plan was put into place, a compensation plan which the JENKON system was incapable of processing. (*Id.* at 52.) A new software application was developed by the in-house IT staff which was capable of processing the new compensation plan and was used after October 2003. (*Id.* at 52-53, 57.) ICR's use of the JENKON system was also restricted when, in October 2003, it discontinued payment to Jenkon International for support services. (*Id.* at 51-52.) In other words, ICR did not continue to rely on the JENKON system in its business operations after October 2003 because they did not have support services from Jenkon International and because they switched to a new compensation plan that the JENKON system could not process.

---

[14] *See also* Pl.'s Resp., Ex. 2 at 5 [Docket Text # 101] ("[I]t appears that the last commission run was performed on November 7, 2003."); *id.* at 7 ("The last time [the AUDIT.DTL.DATA file] was updated was February 11, 2004 at 12:07pm."); *id.* at 10 ("[T]he Distributor file ... was last updated on February 11, 2004 at 1:58pm."); Leisner's June 10, 2009 Report at 2 ("The range of dates for the 97 contact records [of suspended and/or terminated representatives] is February 15, 2000 through November 14, 2003.").)

The last commission transaction run off the JENKON system was in October 2003. (Evid. Hr'g Tr. at 52, Feb. 20, 2007.) (*See also* Pl.'s Resp., Ex. 2 at 5 [Docket Text # 101] ("From the date stamp, it appear that the commission run was performed on November 7, 2003. This was likely the commission run performed for October, 2003."); *id.* at 6 ("I did find that the most recent commission run was for the month ending October 31, 2003.").) The JENKON system was still capable of running after that date, but with limited functions (i.e., looking up historical information). (Evid. Hr'g Tr. at 53, Feb. 20, 2007.) (*See also* Pl.'s Resp., Ex. 2 at 11-12 [Docket Text # 101] ("My next step was to look at the EFT.DATA file. This file contains a record every time a person runs a program using the Jenkon software. It appears that the last time a program was run using the software was on December 23, 2003. ... [I]t appears that the use of the Jenkon software was significantly diminished in October, November and December 2003."); *id.* at 19 ("There are only sporadic transactions dated November 7, 2003 through February 2004.").) Moreover, according to Griffin's testimony, no new information was being entered into the JENKON system after October 2003.[15] (Evid. Hr'g Tr. at 53, 63, 83, Feb. 20, 2007.)

Griffin's testimony, thus, provides a plausible explanation to Leisner's reservations as to the completeness of the Back-Up for the period between November 7, 2003 and February

_____

[15] Enzo Pavone corroborated this part of Griffin's testimony. Enzo testified that ICR stopped using JENKON in October 2003 and no new information was added after that time—any information relating to representatives post November 2003 was kept in some other form. (Evid. Hr'g Tr. at 27, 51, 60, Feb. 21, 2007.)

John Canzoneri, ICR's network administrator, also corroborated Griffin's testimony that there was no data entry into JENKON system after October 2003. (Evid. Hr'g Tr. at 110-11, 120, Feb. 20, 2007.)

Canzoneri's successor, Ian Bible, also testified that he never saw the JENKON system being used and never saw anyone access it or input any information into it. (Evid. Hr'g Tr. at 139, Feb. 20, 2007.)

11, 2004, supporting Leisner's opinion that: "It appears that the [Back-Up] contained a copy of Jenkon software with data of ICR Services as of February 11, 2004." (Pl.'s Resp., Ex. 2 at 18 [Docket Text # 101]; Leisner Aff., Defs.' Reply, Ex. 4 at 3 [Docket Text # 106].) The testimony from the evidentiary hearing supports the conclusion that the Back-Up is a complete copy of the JENKON system, at least, through February 11, 2004.

Subsequent to February 11, 2004, according to Griffin, Enzo, Canzoneri and Bible's testimony, no new information was being entered into the JENKON system. (*See*, *supra*, n.15.) Defendants have not proffered any evidence to suggest that any data was being entered into the JENKON system after February 11, 2004. Thus, there is no basis in fact for this Court to conclude that any information—let alone material or exculpatory evidence—was entered into JENKON between February 11, 2004 and July 26, 2004 (the date that Renzi turned over to Special Agent Mark Benston the JENKON disks).

### 2. Hard Paper Copies: The "Bates Files"

Defendants also contend that ICR utilized JENKON almost exclusively to track and report any disciplinary action of its representatives. Evidence presented during the hearings on this matter, however, stands in contrast to Defendants' assertion. The testimony established that the type of information Defendants claim they were deprived of was actually maintained in hard copy files kept in the office of Jim Bates, ICR's fraud investigator (Bates Files).

At the evidentiary hearing held on February 20-21, 2007, Griffin testified that ICR kept hard copy disciplinary files for its representatives that had been terminated, disciplined or suspended.

> When an independent director was terminated or suspended, the file was prepared by Jim Bates, who was in charge of the fraud department, and he kept those files. ...
>
> He had file cabinets. They were hard copies of files that had letters, disciplinary letters, documentation as to whatever it was that occurred that caused the termination or suspension, and he had file cabinets where he kept all those records.

(Evid. Hr'g Tr. at 59, Feb. 20, 2007.) Griffin also testified that everyone in management knew about the Bates files because they had periodically requested information from him pertaining those disciplined representatives. (*Id.* at 59-60.) (*See also id.* at 103-04 ("There was backup in the form of [hard copy] files for the disciplinary action ... [The Bates files] dealt with terminations and suspensions, every distributer that was terminated or suspended had a file in his office."); *id.* at 107 (In response to the question: "Miss Griffin, with regard to Mr. Bates' files, is it accurate to say that Mr. Bates' files would contain all of the information that the Jenkon file contained with respect to any representative who received any type of cease and desist or reprimand?", Griffin answered: "Yes." Griffin went on to testify: "not for something small. If they were terminated or had disciplinary action taken against them, he would have a file containing that and other information.").)

Jim Bates also testified at that evidentiary hearing. Bates testified that he was hired into ICR's "fraud investigations department ... to act as a liaison between the representatives ... to search for any type of fraud from them or—as a result of them not following the terms and condition of the contracts that they have." (*Id.* at 155-56.) Any time disciplinary action was taken against a representative,[16] Bates "kept a file an the individual which contained the basic, the first complaint, my suspension letter, the termination letter, and any other

---

[16] Bates testified that he "did approximately 450-500 terminations." (*Id.* at 161.)

evidence to, you know, that might be evidence on that case. ... Those files were kept in file cabinets in my office." (*Id.* at 157.) (*See also id.* at 165 (In response to the question: "The work you generated in the course of your investigations, whether they ended up in a termination or not, that was work contained at Jenkon, or did you keep it in the hard copy files," Bates responded: "I kept it in the hard copy files."); *id.* at 166 ("In response to the question: "would it be a fair statement or a true statement that the only place disciplinary information ... was kept was on Jenkon," Bates responded: "Disciplinary information was not kept on Jenkon," it was kept in hard copy files.).) Moreover, Bates testified that "[j]ust about everybody in the company" knew he kept those files, "including the principals." (*Id.* at 157.)

Bates predecessor, Frederick Austin also testified. Austin testified that he was aware of the Bates files, that "[t]hose files were files that contained records of reps that were terminated or suspended," and that he used them on several occasions. (*Id.* at 191.)

This testimony supports the conclusion that the purportedly exculpatory and impeaching information Defendants claim has been destroyed was not exclusively kept in the JENKON system. The testimony also established that the information memorialized in the JENKON system was limited to infrequent and brief notes as well as a cross reference to the Bates Files.[17] (*See* Evid. Hr'g Tr. at 61, Feb. 20, 2007 (Griffin testified that long narratives were not entered into the JENKON system, only brief notes. "If there was action taken, disciplinary wise, that would also be noted in that note section to refer to most likely

---

[17] The government has no idea what happened to the vast majority of the "Bates files," only that they were in Defendants' control and custody. According to Bates' testimony, all of his files were at ICR when he left in 2003. (Evid. Hr'g Tr. at 169, Feb. 20, 2007.) According to Austen's testimony, all of his files were at ICR when he left in 2004. (Evid. Hr'g Tr. at 193, Feb. 20, 2007.)

Jim Bates for information."); *id.* at 85 ("The information pertaining to distributers when they were under disciplinary action would initially be entered [into JENKON] with a reference to refer to someplace else for details."); *id.* at 164-65 (Bates testified that "as far as my input into Jenkon, the only thing I would put into Jenkon is when I did suspend a rep, I would ... make a note into the Jenkon system saying that this representative is suspended, and 'see Jim Bates' files.'"); *id.* at 193 (In response to the question: "If you needed information on reps who had been disciplined would you go to Jenkon to get that?," Austen replied: "Jenkon would just have a reference to 'see Jim Bates' or to 'see Jim Bates' files.'").)

## III. Conclusion

For the foregoing reasons, Defendants' motion is hereby DENIED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: April 7, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 7, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager